## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AUTOMOTIVE PROFESSIONALS, INC., | ) | Case No. 08 C 1550 |
| | ) | |
| Debtor. | ) | Hon. Robert M. Dow, Jr. |
| | ) | |
| | ) | |
| FRANCES GECKER, not individually but as Chapter 11 | ) | |
| trustee of the bankruptcy estate of Automotive | ) | |
| Professionals, Inc., and the OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS of Automotive | ) | |
| Professionals, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARATHON FINANCIAL INSURANCE CO., INC., | ) | |
| RRG, | ) | **Hearing Date: June 19, 2008** |
| | ) | **Hearing Time: 9:15 a.m.** |
| Defendant. | ) | |

### TRUSTEE'S RESPONSE TO
### MARATHON FINANCIAL INSURANCE CO., INC.'S
### <u>MOTION TO WITHDRAW THE REFERENCE</u>

Frances Gecker (the "Trustee"), as Chapter 11 trustee of the bankruptcy estate of

Automotive Professionals, Inc. ("API" or the "Debtor"), by her attorneys, respectfully submits

this response to the Motion To Withdraw the Reference and Brief in Support Thereof (the

"Withdrawal Motion") filed by Marathon Financial Insurance Co., Inc. ("Marathon"), and states

as follows:

### <u>INTRODUCTION</u>

A motion to withdraw the reference is not an avenue to escape bankruptcy court for a

friendlier forum. Yet, that is precisely the ruse Marathon attempts. Even before the

commencement of API's bankruptcy case, API's creditors brought a class-action lawsuit against

Marathon in the Circuit Court of Cook County based on the same material facts set forth in the Adversary.  On March 19, 2007, that case was removed to this Court, docketed as *Lewis v. Marathon Financial Insurance Corp., et al.*, Case No. 07-1508, and assigned to Judge Gettleman (the "Prepetition Case").  Although Marathon's attorneys in the Adversary also represented Marathon in the Prepetition Case, Marathon never demanded a jury trial in the Prepetition Case.[1]

It is not surprising that Marathon wants a jury trial now, when it did not want a jury trial a year earlier in virtually the identical case.  The only basis for withdrawal Marathon can assert is its right to a jury trial.[2]  Without the jury trial right, Marathon has no means to ever avoid the knowledge and experience the Bankruptcy Court brings to this Adversary.

Since API's bankruptcy case was filed more than a year ago, the Bankruptcy Court has become familiar with: (1) the history of API's business selling vehicle service contracts ("VSCs"); (2) API's complex network of relationships with its affiliates, automobile dealerships, agents, consumers, state regulatory agencies and insurers; (3) the various agreements and insurance policies pursuant to which these parties operated; and (4) the material facts relevant to the Adversary.  A year ago, in June, 2007, the Bankruptcy Court held an evidentiary hearing in connection with certain creditors' Motion for Appointment of Chapter 11 Trustee, during which the Bankruptcy Court heard extensive testimony focusing on material facts relevant to this Adversary.  On the basis of such testimony, the Bankruptcy Court observed that Marathon's failure to acknowledge its obligations under insurance policies from which Marathon derived millions of dollars in premiums appeared to work a fraud on API's consumers:

> [Marathon] was taking $15 million in a premium knowing it would never be liable. So it's essentially a fraud, to use a completely strong and perhaps unjustified word.  But it's – "illusory" has been a word used.

---

[1] The Prepetition Case was voluntarily dismissed after the appointment of the Trustee based on the Trustee's representation that she intended to pursue the claims set forth therein, for the benefit of all of API's creditors.

[2] On June 11, 2008, the Bankruptcy Court entered its Order and Memorandum Opinion denying the Trustee's Motion to Strike Jury Demand.

Exhibit A, p. 80.  It is therefore not surprising that, despite not having done so in the Prepetition Case, Marathon now asserts its right to a jury trial in the hopes of finding a friendlier forum.

This Court has discretion to determine whether to take this case now, or let the case proceed in the Bankruptcy Court until trial ready.  Indeed, courts in this circuit routinely deny motions for withdrawal of the reference until trial ready in the interest of judicial economy, conservation of the parties' resources, uniform administration of bankruptcy cases, and the alleviation of concerns over forum-shopping.  *See, e.g., In re Conseco,* 324 B.R. 50, 54-56 (N.D. Ill. 2005).  Marathon will have its day before a jury.  But before that day comes, this Adversary should stay with the Bankruptcy Court, who is best-equipped to quickly move this case to the brink of trial and the jury Marathon desires.

## BACKGROUND

On April 13, 2007 (the "Petition Date"), API filed a voluntary chapter 11 bankruptcy petition.  On June 6, 2007, the Bankruptcy Court ordered the appointment of a Chapter 11 trustee. Upon the recommendation of the U.S. Trustee, on June 12, 2007, the Court approved the appointment of Frances Gecker as Chapter 11 Trustee.

On February 15, 2008, the Trustee and the Official Committee of Unsecured Creditors of API (the "Committee") filed a six count complaint against Marathon, as follows:

| | |
|---|---|
| Count I: | Fraud in the Inducement |
| Count II: | Avoidance of Fraudulent Transfers Regarding Insurance Premiums |
| Count III: | Avoidance of Fraudulent Transfers Regarding the Issuance of Marathon Policy M34164 |
| Count IV: | Breach of Contract |
| Count V: | Promissory Estoppel |
| Count VI: | Unjust Enrichment |

Numerous factual allegations in the Complaint are from the sworn testimony before the Bankruptcy Court in the pleadings and hearings on the Motion of the Illinois Director of Insurance to Dismiss Chapter 11 Case and the Motion of Certain Creditors to Appoint Chapter 11 Trustee. The Bankruptcy Court already has heard testimony and reviewed the documents that set forth the business relationship between Marathon and API, an Illinois corporation that was in the business of selling vehicle service contracts ("VSCs"). VCSs provide for the payment of covered vehicle repairs after the expiration of the manufacturer's warranty. In addition, API's VSCs included an option called a guaranteed price refund ("GPR"), which entitled the purchaser to a refund of a portion of the purchase price of the VSC if no repair claims had been made during the term of the contract. At the time of API's bankruptcy filing, API had outstanding VSCs with approximately 254,000 consumers in 46 states.

API obtained replacement insurance coverage from Marathon, a virtually unknown risk retention group, after API's prior insurer, Travelers Indemnity Company, discontinued coverage. At the core of the Trustee's complaint are the following misrepresentations made by Marathon, which already have been the subject of proceedings before the Bankruptcy Court:

First, the Marathon-backed VSCs, which were approved by Marathon, contain notice provisions representing that consumers may make claims directly against Marathon upon API's failure to pay covered claims within 60 days. In fact, in its opposition briefs to the Illinois Insurance Director's Motion to Dismiss, Marathon admitted its obligations to consumers under the Marathon-backed VSCs. Bankruptcy Docket No. 120, ¶ 6; Bankruptcy Docket No. 148, ¶ 6.

Second, Marathon represented that its coverage would match the coverage previously provided under Travelers' policies, *i.e.*, Marathon would pay covered claims upon API's failure to do so.

Third, Marathon represented that API and the Dealers would be covered directly under Marathon's reinsurance policies with Swiss Reinsurance America Corporation ("Swiss Re"), and Hannover Reinsurance (Ireland) Limited and E – S Reinsurance (Ireland) Limited (collectively, "Hannover Re"), two of the world's largest reinsurers.

Moreover, the Bankruptcy Court is familiar with the Dealer incentive programs approved by Marathon, the maintenance of the reserve accounts, the guaranteed price refund policies and the insurance policies themselves.

After hearing extensive testimony regarding these matters, the Bankruptcy Court observed:

> [T]he whole situation just begs the question of if Marathon was fully aware of the GPR, what was going to take the position that payment of GPR or anything else, or even paybacks to the dealers, which I'm not quite sure about how all that works, won't count, then [Marathon] was taking $15 million in a premium knowing it would never be liable. So it's essentially a fraud, to use a completely strong and perhaps unjustified word. But it's – "illusory" has been a word used.

Bankruptcy Court Hearing Transcript p. 80, Exhibit A hereto.  Given the extant knowledge of the Bankruptcy Court, it is not surprising that Marathon wants to be in a different court.

### The Withdrawal Motion

As a first step in its exit strategy, on February 29, 2008, Marathon filed its Jury Demand. On March 14, 2008, Marathon filed its Motion to Dismiss, seeking the dismissal of Counts I and II, and challenging the standing of the Committee.  On March 20, 2008, the Trustee filed her Motion to Strike Jury Demand.  On March 14, 2008, Marathon filed its Withdrawal Motion.  On March 17, 2008, Marathon filed its Answer and Affirmative Defenses to the Complaint.  On April 14, 2008, the Trustee filed her motion to join the Committee as a co-plaintiff in the Adversary.

At the initial hearing on the Withdrawal Motion, this Court indicated that it would defer its ruling until after the Bankruptcy Court ruled on the Trustee's Motion to Strike Jury Demand. On June 11, 2008, the Bankruptcy Court entered its order denying that motion.  At the June 10, 2008 status hearing in the Adversary, the Bankruptcy Court indicated that it would defer until after this Court's ruling on the Withdrawal Motion, whether or not it would rule on Marathon's Motion to Dismiss.  At the June 17, 2008 hearing on the Trustee's Motion to Join The

Committee as a Co-Plaintiff, the Bankruptcy Court announced its ruling, to be issued in a written decision, that the Committee will be dismissed as a co-plaintiff for lack of standing.

## ARGUMENT

The Withdrawal Motion should be denied without prejudice. Marathon seeks withdrawal of the reference of the Adversary on the sole ground that it is entitled to a jury trial. However, leaving the Adversary in the Bankruptcy Court will not impair Marathon's right to a jury trial. The case is far from ready for trial.  Discovery has not yet commenced, and the case likely will not be ready for trial for another year. *See* Amended Joint Scheduling Conference Report filed in the Adversary on June 16, 2008. During that time, the Adversary could be resolved either through settlement or summary judgment.  Thus, it is possible that the Adversary will never go to trial.  In the interests of judicial efficiency, conservation of the parties' resources, and uniformity of the administration of the bankruptcy case, pre-trial matters should therefore be left with the Bankruptcy Court.

> It is well-settled that a district court is not compelled to withdraw a reference simply because a party is entitled to a jury trial. "A District Court may consider a demand for a jury trial insufficient cause for discretionary withdrawal if the motion is made at an early stage of the proceedings and dispositive motions may resolve the matter ...." Courts have ... recognized that it serves the interests of judicial economy and efficiency to keep an action in Bankruptcy Court for the resolution of pre-trial, managerial matters, even if the action will ultimately be transferred to a district court for trial.

*In re Technologies Liquidations Co.*, 2007 WL 1152518, *2  (W.D. Pa. Apr. 17, 2007); *quoting Am. Classic Voyages Co. v. Westaff (USA), Inc.,* 337 B.R. 509, 512 (D. Del. 2006) (citations omitted); *see also Growe v. Bilodard, Inc.,* 325 B.R. 490 (D. Maine 2005); *In re Commercial Financial Services, Inc.*, 239 B.R. 586, 596-97 (Bankr. N.D. Okla. 1999) ("Many district courts have held that withdrawal of the reference on the ground that a party is entitled to a jury trial should be *deferred* until the case is 'trial ready.'") (citing cases).

As this Court noted in *In re HA 2003, Inc.*, 2004 WL 609799, \*2 (N.D. Ill. Mar. 24, 2004), "[w]ithdrawal of a reference is not intended to be an escape hatch from bankruptcy to district court." Rather, withdrawal "is the exception, not the rule." *Id.*  In determining whether to exercise its discretion to withdraw the reference, the Court should consider the following factors:

- judicial economy
- convenience
- the Bankruptcy Court's knowledge of the facts
- promoting uniformity and efficiency of bankruptcy administration
- reduction of forum shopping and confusion
- conservation of debtor and creditor resources
- whether the parties requested a jury trial

*CDX Liquidating Trust v. Venrock Associates*, 2005 WL 3953895, \*1 (N.D. Ill. Aug. 10, 2005);  *In re Sevko*, 143 B.R. 114, 117 (Bankr. N.D. Ill. 1992).

As set forth above, the Bankruptcy Court has had significant experience with the parties and the facts underlying the Adversary.  Since the Petition Date, more than a year ago, the Bankruptcy Court has dealt with a number of complex issues relating to API's business, including API's relationships with its affiliates, its insurers, its Dealers and its customers. Numerous matters, including the Illinois Insurance Director's Motion to Dismiss, the Motion For Appointment of Chapter 11 Trustee, and several motions seeking approval of the Trustee's settlements with Dealers and agents, were contested. The knowledge of the facts that the Bankruptcy Court has acquired is a significant resource that should not be squandered.  Rather, the Bankruptcy Court's continued role in pretrial matters will enhance the efficiency of the litigation until the Adversary is ready for trial:

> [I]t makes little sense to withdraw the case at this stage given the bankruptcy court's familiarity with the parties and the complex facts of the case and its three-year tenure presiding over the bankruptcy proceedings. Leaving all pre-trial matters, including the fully briefed motion to dismiss, in [the Bankruptcy Court's] capable hands will make the best use of the courts' and the parties' resources and eliminate any forum-shopping concerns.

*CDX Liquidating Trust*, 2005 WL 3953895, \*4; *see also In re Conseco*, 324 B.R. 50, 54-56

(N.D. Ill. 2005) (denying as premature, until trial, a motion to withdraw reference in the interests of judicial economy, the conservation of the parties' resources, the uniform administration of bankruptcy cases, and the alleviation of concerns over forum-shopping); *ABC-NACO, Inc. v. Klos Trucking, Inc.*, 2004 WL 728190, *2 (N.D. Ill. Mar. 31, 2004)(same).

## CONCLUSION

Marathon's right to a jury trial will not be impaired by leaving the Adversary in the Bankruptcy Court for pre-trial matters.  In fact, it makes little sense to withdraw the reference now in light of (1) the Bankruptcy Court's familiarity with the parties, and their complex business relationships and underlying documents, and (2) significant concerns that Marathon seeks withdrawal as a litigation tactic. For the reasons set forth above, pre-trial matters in the Adversary should remain in the Bankruptcy Court, and the Withdrawal Motion should be denied without prejudice.

Respectfully submitted,

FRANCES GECKER, not individually, but as
Chapter 7 Trustee of the bankruptcy estate of
Automotive Professionals, Inc.

By: _____ */s/ Micah R. Krohn* _____
One of her attorneys

Joseph D. Frank (ARDC #6216085)
Alan B. Rich (ARDC #6189687)
Micah R. Krohn (ARDC #6217264)
FRANK/GECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois  60610
Phone: (312) 276-1400
Fax:    (312) 276-0035

Dated: June 17, 2008

## CERTIFICATE OF SERVICE

I, Micah R. Krohn, an attorney, hereby certify that on **June 17, 2008**, a true and correct copy of the foregoing **Trustee's Response To Marathon Financial Insurance Co., Inc.'s Motion To Withdraw The Reference** was filed electronically.  Notice of the filing will be sent to all parties who are currently on the Court's Electronic Mail Notice List by operation of the Court's Electronic Filing System.

_____ */s/ Micah R. Krohn* _____

# EXHIBIT A

1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4     In re:                        )
                                     ) No. 07 B 06720
 5     AUTOMOTIVE PROFESSIONALS, INC., )
                                     ) Chicago, Illinois
 6                                   ) June 6, 2007
                          Debtor.    ) 1:00 p.m.
 7

 8          TRANSCRIPT OF PROCEEDINGS BEFORE THE
                 HONORABLE CAROL A. DOYLE
 9

10     APPEARANCES:

11     MR. GEORGE APOSTOLIDES
       on behalf of the agent creditors;
12
       MR. PETER ROBERTS
13     on behalf of the Herb Chambers Companies;

14     MR. TONY STAMATO
       on behalf of Dealer Financial Services;
15
       MR. STEVEN BOBO
16     MR. ERICH BUCK
       on behalf of Automotive Professionals, Inc.;
17
       MS. KATY GLEASON
18     on behalf of the United States Trustee;

19     MR. THOMAS AUGSPURGER
       on behalf of Goldman Sachs Company.
20

21

22

23

24

25
```

2

# I N D E X

| WITNESS: | DX | CX | REDX | RECX |
|----------|-----|-----|------|------|
| JIM HAWK | | 10 | | |
| | | 24 | 63 | 74 |
| | | 49 | 87 | 85 |

1    just to reiterate, you don't know what the

2    attachment point is?

3            A    Oh, I didn't say that.

4            Q    Okay.  Is it fair to say you don't know

5    what the number is?

6            A    I don't know what the number is.  And in

7    fact, I don't know how anyone could know unless we

8    did an actuarial study to determine that.

9            Q    Which has not ever been done?

10           A    That is correct.

11           Q    Is it fair to say you do not know if API

12   had enough money to ever reach the attachment point?

13           A    It's fair to say that in January of 2007

14   I was convinced that API did not have that much

15   money.

16           THE COURT:  How much money to reach the

17   attachment point?

18           MR. APOSTOLIDES:  How much money -- that

19   API did not have enough money to pay enough in

20   claims to reach the attachment point number.  Let me

21   do it a different way.

22           THE COURT:  Well, let me just ask because

23   I'm the one who's got to get it here.

24               So the attachment point is when all

25   of the money taken into reserves is paid out on

78

1    claims?

2              THE WITNESS:  No.

3              THE COURT:  Okay.  What?

4              THE WITNESS:  It's when the amount of

5    claims that have been paid equals the amount of

6    reserves that were ever collected.

7              THE COURT:  Okay.  So you take all of the

8    reserves that's ever been collected, you add them

9    all up.  You take all of the claims that have ever

10   been paid, you add them up.  The attachment point

11   for Marathon is when those numbers are equal?

12             THE WITNESS:  Let me do a little

13   illustration, if you will.  Let's say we

14   collected -- in the program we sold $100 -- we sold

15   contracts and collected $100 of reserves.

16             THE COURT:  Um-hmm.

17             THE WITNESS:  And then we started

18   receiving claims, and we got $90 in claims, and then

19   we got 10 more dollars in claims, and then we got 10

20   more dollars in claims.  At that point we would have

21   $110 worth of claims.  The last $10 would have been

22   subject to the attachment point.

23             THE COURT:  Right.  Okay.  So when you

24   ask questions, Mr. Apostolides, about...

25             MR. APOSTOLIDES:  Whether there was

1   enough money, what I think Mr. --

2           THE COURT:  Would API ever have enough

3   money to reach the attachment point, I'm not really

4   understanding that question.

5   BY MR. APOSTOLIDES:

6       Q   As of January of 2007, let's use a

7   hypothetical, the attachment point is a hundred

8   dollars, okay?  That's the number of --

9       A   Funds collected.

10      Q   -- reserves that have been collected.  If

11  API has 70 bucks to pay claims and it pays all of

12  its $70 in claims, it still would not reach the

13  attachment point, right?

14      A   That's correct.

15      Q   So the Marathon insurance would not kick

16  in as you understand it?

17      A   The attachment point would not have been

18  reached.

19      Q   The attachment point would not have been

20  reached.

21          THE COURT:  And that's because the --

22          MR. APOSTOLIDES:  API didn't have enough

23  money.

24          THE COURT:  Well, the money from the

25  reserves was spent on things other than paying

1   claims, right?  That can be the only reason that the

2   attachment wouldn't be reached.

3              THE WITNESS:  The money -- yes.

4              THE COURT:  Okay.

5              THE WITNESS:  And that's because in our

6   case, 16 plus millions of dollars had been returned

7   to dealers under the dealer agreements, the

8   incentive programs under the dealer agreements.

9              MR. APOSTOLIDES:  Okay.  Do you need

10  anything else on that, Judge?

11             THE COURT:  Well, I mean the whole

12  situation just begs the question of if Marathon was

13  fully aware of the GPR, what was going to take the

14  position that payment of GPR or anything else, or

15  even paybacks to the dealers, which I'm not quite

16  sure about how all that works, won't count, then it

17  was taking $15 million in a premium knowing it would

18  never be liable.  So it's essentially a fraud, to

19  use a completely strong and perhaps unjustified

20  word.  But it's -- "illusory" has been a word used.

21             THE WITNESS:  What we're not taking into

22  account is the loss experience in the program.  And

23  the program in the Marathon program was targeted at

24  a 95-percent loss ratio.  The fact is it

25  was improving beyond that.  But what was going to be